# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-CV-81334-WPD

UNITED STATES OF AMERICA
*ex rel*. CLIFFORD BARON

      Plaintiff/Relator,

v.

RENNOVA HEALTH, INC., PB LABORATORIES,
LLC d/b/a COLLECTAWAY, LLC, MEDYTOX
MEDICAL MARKETING & SALES, INC.,
SEAMUS LAGAN, ALCIMEDE, INC.,
JELLICO MEDICAL CENTER, INC.,
JAMESTOWN TN MEDICAL CENTER d/b/a
JAMESTOWN REGIONAL MEDICAL CENTER,
RENNOVA COMMUNITY HEALTH, INC.,
PLATINUM FINANCIAL SOLUTIONS, LLC., and
CHRISTOPHER DIAMANTIS,

      Defendants.

_____/

## UNITED STATES OF AMERICA'S SECOND AMENDED COMPLAINT IN INTERVENTION
## (JURY TRIAL DEMANDED)

The United States of America ("United States" or "Government") brings this action against

Defendants Rennova Health, Inc., PB Laboratories, LLC, Medytox Medical Marketing & Sales,

Inc., Seamus Lagan, Alcimede, Inc., Jellico Medical Center, Inc., Jamestown TN Medical Center,

Rennova Community Health, Inc., Platinum Financial Solutions, LLC, and Christopher Diamantis

to recover treble damages and civil penalties for their violations of the False Claims Act ("FCA"),

31 U.S.C. §§ 3729–3733, stemming from the receipt and improper retention of funds distributed

through the Provider Relief Fund Program. Now, having previously filed a Notice of Intervention

pursuant to 31 U.S.C. § 3730(b)(4), [D.E. 18] and obtaining leave of court to file this amended

complaint, [D.E. 52] the United States alleges the following in support of its Second Amended Complaint in Intervention:

1.     The United States brings this action to recover treble damages, civil penalties, and costs under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law and equitable theory of unjust enrichment.

2.     This action arises from false statements and claims that Defendants Rennova Health, Inc. (hereinafter, "Rennova") and its various subsidiaries and employees knowingly presented to, or caused to be presented to, the United States, the United States Department of Health and Human Services ("HHS"), and the Health Resources and Services Administration ("HRSA"), in violation of the FCA and common law.

3.     At the onset of the COVID-19 Pandemic in 2020, the United States enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") and established the Provider Relief Fund Program ("PRF Program"). The PRF payments are funded through appropriations authorized by the CARES Act (P.L. 116-136), the Paycheck Protection Program and Healthcare Enhancement Act (P.L. 116-139), and the Coronavirus Response and Relief Supplement Appropriations Act (Division M of P.L. 116-260). The PRF Program provided payments to healthcare providers, based on their 2019 Medicare billing, to assist in the response to the global pandemic.

4.     Rennova owned and operated three rural hospitals in Tennessee that benefited from the PRF Program, receiving nearly $13 million in distributions over a four-month span.

5.     As a result of using a significant portion of this money to pay insiders, creditors, and executives rather than for pandemic-related expenses, Rennova to failed to make payroll at

these hospitals within months of receiving PRF money. Within a year, Jellico Medical Center, a recipient of over $8.5 million in PRF payments, would close its doors.

6.      Recipients of PRF payments attest and agree to comply with Terms and Conditions for the PRF program, including agreement to fully cooperate in all audits conducted by HRSA and reporting on the uses of PRF funds. Under the terms and conditions of the PRF Program, recipients must justify retention of PRF distributions by submitting reports to the United States. Alternatively, recipients may reimburse the Government for unspent or unused funds. Rather than provide accurate accountings of its use of the funds or repay the United States, the Defendants submitted inaccurate or fraudulent reports to the United States to avoid the obligation to repay these monies.

**Parties**

7.      Plaintiff is the United States of America, suing on behalf of the United States Department of Health and Human Services ("HHS"), which includes its operating subdivision, the Health Resources and Services Administration ("HRSA"). At all times relevant to this Complaint, HHS and/or HRSA administered and supervised the PRF Program.

8.      The *qui tam* relator, Clifford Baron, filed an action alleging violations of the FCA on behalf of himself and the United States Government pursuant to the *qui tam* provisions of the FCA on August 2, 2021 [D.E. 1]. Baron is a former employee of CollabRX, a former subsidiary of Rennova.

9.      Following the termination of his employment at CollabRX, Relator obtained a default judgment against Rennova and sought to collect in the State of Tennessee. During the review of discovery in his collection action, Relator discovered accounting issues that led to the filing of his *qui tam* complaint.

10.    Rennova is a Delaware publicly traded corporation (OCTMKTS: RNVA) with a principal address at 400 South Australian Avenue, Suite 800, West Palm Beach. Florida.

11.    PB Laboratories, LLC d/b/a Collectaway, LLC is a Florida Limited Liability company with a principal address of 400 South Australian Avenue, Suite 800, West Palm Beach, Florida. PB Laboratories is a wholly-owned subsidiary of Rennova.

12.    Platinum Financial Solutions, LLC, is a Florida Limited Liability Company with a principal address of 400 South Australian Avenue, Suite 800, West Palm Beach, Florida. Platinum Financial Solutions is a wholly-owned subsidiary of Rennova.

13.    Medytox Medical Marketing & Sales, Inc. is a Florida for profit corporation with a principal address of 400 South Australian Avenue, Suite 800, West Palm Beach, Florida. Medytox Medical Marketing & Sales is a wholly-owned subsidiary of Rennova.

14.    Rennova Community Health, Inc., ("RCH") is a Florida for profit corporation with a principal address of 400 South Australian Avenue, Suite 800, West Palm Beach, Florida. RCH is a wholly-owned subsidiary of Rennova.

15.    Alcimede, Inc. is a Delaware corporation with file number 4479543 and no registered address. The corporation is owned by Defendant Seamus Lagan, who is its sole manager.

16.    Seamus Lagan is a private individual who, on information and belief, resides in Northern Ireland in the United Kingdom. Mr. Lagan is the CEO of Rennova Health, Inc., and the owner of Alcimede, Inc.

17.    Rennova contracts with and pays Alcimede for the services that Mr. Lagan provides as CEO of Rennova. Mr. Lagan does not receive a salary directly from Rennova; instead, Alcimede bills Rennova for his services. In 2020, Rennova paid Alcimede $642,962 for his services.

18.    Jamestown TN Medical Center, operating as Jamestown Regional Medical Center ("Jamestown") is a Tennessee Limited Liability Corporation with a principal office at 4000 Meridian Blvd., Franklin, Tennessee.

19.    Jellico Medical Center, Inc., ("Jellico") is a Tennessee Corporation with a principal address of 400 South Australian Avenue, Suite 800, West Palm Beach, Florida.

20.    In 2019, Jellico became the tenant of a facility lease agreement with the City of Jellico, Tennessee. The lease agreement required Jellico to operate an acute care hospital in Jellico ("Jellico Hospital"). The lease agreement called for Jellico to pay $1 annually in rent and to maintain the building. The City of Jellico terminated the lease in March 2021.

21.    Christopher Diamantis is a private individual who resides in Nashville, Tennessee.

22.    Mr. Diamantis is a former board member of Rennova, having resigned from the board on February 26, 2020.

23.    Both during his board membership and after, Mr. Diamantis remained intimately involved in the banking and financial aspects of Rennova and its subsidiaries and held frequent written and spoken correspondence with Mr. Lagan regarding the same. In Rennova's 2021 10-K filing, Rennova noted that during the years ended December 31, 2021 and 2020, Mr. Diamantis issued loans integral to the continued operation of the company. *See* Rennova Fiscal Year 2021 10-K, p. 38, available at https://ir.rennovahealth.com/all-sec-filings/content/0001493152-22-010066/0001493152-22-010066.pdf (last accessed Jan. 31, 2023).

24.    In applications for Paycheck Protection Program relief submitted to the United States in 2020 and 2021, Rennova identified Mr. Diamantis as an individual with a 20 percent or greater ownership interest in Rennova and its subsidiaries.

*Rennova and Lagan's Control of its Subsidiaries*

25.     At all times relevant, a unity of interest and ownership existed between Defendant Rennova and Defendants PB Laboratories, Platinum Financial Solutions, LLC, Medytox Medical Marketing & Sales, Inc., and Rennova Community Health, Inc., such that any individuality and separateness between Rennova and each of these subsidiaries existed such that each is an alter ego of Rennova as Rennova controls the business and daily operations of each.

26.     Rennova and its CEO, Mr. Lagan, exercised strict control, supervision, and dominion over the activities of Defendants PB Laboratories, Platinum Financial Solutions, LLC, Medytox Medical Marketing & Sales, Inc., and Rennova Community Health, Inc, which all claim identical principal places of business in West Palm Beach, Florida.

27.     At all times relevant, Rennova and its CEO, Mr. Lagan, maintained exclusive control over the bank accounts and the use of funds therein for Defendants PB Laboratories, Platinum Financial Solutions, LLC, and Medytox Medical Marketing & Sales, Inc. PB Laboratories and Platinum Financial Solutions, LLC, are corporations whose purpose was/is to operate bank accounts used to hold the fund receivable for all companies held in Rennova's corporate umbrella.

28.     At all times relevant, Rennova and its CEO, Mr. Lagan maintained strict control over the activities, decisions, operations, personnel decisions, and goals for Rennova Community Health, Inc. Specific to the matters in this Complaint, Rennova used Rennova Community Health, Inc., to perform audits and reports related to its compliance with Government regulations, including those required to comply with the CARES Act. However, Mr. Lagan limited the information available to personnel conducting these tasks such that it hampered their ability to adequately and accurately perform these duties.

29.     Adherence to the fiction of the separate existence of Defendants PB Laboratories, Platinum Financial Solutions, LLC, Medytox Medical Marketing & Sales, Inc., and Rennova Community Health, Inc., as entities distinct from Rennova would permit an abuse of the corporate privilege and would sanction fraud and promote injustice.

## Jurisdiction and Venue

30.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). Additionally, the FCA specifically confers jurisdiction upon this Court pursuant to 31 U.S.C. § 3732(b).

31.     This Court has personal jurisdiction over all Defendants identified in causes of action one and two pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States of America.

32.     This Court has personal jurisdiction over Defendant Christopher Diamantis, who is not named in either FCA-related cause of action, under the Florida Long-Arm Statute. *See* Fla. Stat. § 48.193. Under the Florida Long-Arm Statute, this Court may exercise personal jurisdiction over Mr. Diamantis because he operates, conducts, engages in, and carries on multiple business ventures in the state of Florida, namely Rennova and its subsidiaries, that are the subject of this Complaint. *See* Fla. Stat. § 48.193(1)(a)(1), 48.193(2).

33.     This Court may further exercise personal jurisdiction over Mr. Diamantis as the tortious conduct alleged in this complaint, unjust enrichment, occurred in the state of Florida. Specifically, corporations located in the State of Florida that are under Mr. Diamantis' direction

and control issued him millions of payments from distributions under the Provider Relief Fund
Program in violation of the Program's Terms and Conditions. *See* Fla. State §48.193(1)(a)(2).

34.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because the
Defendants reside in and/or transact business in this judicial district, and the acts proscribed by 31
U.S.C. § 3729 and giving rise to the civil penalties under 12 U.S.C. § 1833a occurred in this
district.

## The False Claims Act

35.     Originally enacted in the 1860s to combat fraud against the Union Army during the
Civil War, the False Claims Act, 31 U.S.C. §§ 3729–3733, is the primary tool with which the
United States combats fraud against the Government and protects the federal fisc. The Supreme
Court has held that the False Claims Act's provisions must be construed broadly to reach "all types
of fraud, without qualification, that might result in financial loss to the Government." *United States
v. Neifert-White*, 390 U.S. 228, 232 (1968).

36.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting
or causing to be presented to the United States any false or fraudulent claim for payment or
approval a violation of federal law for which the United States may recover three times the amount
of the damages the government sustains and a civil monetary penalty of between $13,508 and
$27,018 per claim. *See* Civil Monetary Penalties Inflation Adjustment for 2023, 88 Fed. Reg. 19
(Jan. 30, 2023).

37.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making,
using, or causing to be used or made, a false record or statement material to a false or fraudulent
claim, a violation of federal law for which the United States may recover three times the amount

of the damages the Government sustains and a civil monetary penalty of between $13,508 and $27,018 per claim.

38.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), makes "knowingly" making, using, or causing to be made or used "a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government" a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $13,508 and $27,018 per claim.

39.     The False Claims Act defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient. 31 U.S.C. § 3729(b)(2).

40.     The False Claims Act defines "knowing" and "knowingly" to include actual knowledge, deliberate ignorance, and reckless disregard. 31 U.S.C. § 3729(b)(1).

**COVID Pandemic Financial Relief**

41.     In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES" Act), Pub. L. No. 116-136 (Mar. 27, 2020) and appropriated $100 billion "to prevent, prepare for, and respond to coronavirus. . . for necessary expenses to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues." Subsequent appropriations and authority came in the Paycheck Protection Program and Healthcare Enhancement Act, Pub. L. No. 116-139 ($75 billion) and the Coronavirus

Response and Relief Supplement Appropriations Act, Pub. L. No. 116-260, Division M ($3 billion). *Provider Relief Fund Acceptance Terms and Conditions*, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-and-conditions-provider-relief-30-b.pdf (last visited Jan. 31, 2023).

42.     Allocation and payment of the PRF Program funds is overseen by HRSA. Pursuant to the statutory authority, HHS created the Provider Relief Fund and designated to HRSA responsibility for administering that fund. Within HRSA, the Provider Relief Bureau ("PRB") administers four distinct programs under the PRF umbrella. The first and largest program, the PRF Program, is the subject of the dispute here. *HRSA Provider Relief Fund Past General Distributions*, https://www.hrsa.gov/provider-relief/past-payments/general-distribution (last visited Jan. 31, 2023).

43.     HRSA to distributed $50 billion to eligible providers for Phase 1 of the PRF Program. *HRSA Provider Relief Fund Past Payments*, https://www.hrsa.gov/provider-relief/past-payments/general-distribution (last visited Jan. 31, 2023).

44.     HRSA distributed Phase 1 payments between April 10, 2020 and June 30, 2020. *Reporting & Auditing*, https://www.hrsa.gov/provider-relief/reporting-auditing (last visited Jan. 31, 2023).

45.     The amount of each of these payments was determined by each recipient's Medicare fee-for-service reimbursement rates for 2019. *HRSA Provider Relief Fund Past General Distributions*,      https://www.hrsa.gov/provider-relief/past-payments/general-distribution      (last visited Jan. 31, 2023).

46.     Eligibility for the program required recipients to certify (1) that they billed Medicare in 2019, (2) that they provided diagnostic services, testing, and/or care for COVID-19

patients after January 31, 2020, and (3) that they had not been excluded from certain Government healthcare programs. *Provider Relief Fund Acceptance Terms and Conditions*, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-and-conditions-provider-relief-30-b.pdf (last visited Jan. 31, 2023).

47.     Because HRSA dispersed Phase 1 payments automatically, recipients accepted the Terms and Conditions if they did not return the payments within 90 days. *Provider Relief Fund Acceptance Terms and Conditions*, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-and-conditions-provider-relief-30-b.pdf (last visited Jan. 31, 2023).

48.     Under the Terms and Conditions of the PRF Program, recipients are required to submit a report demonstrating either lost revenues or expenses attributable to COVID-19. *HRSA Provider Relief Fund Reporting Requirements and Auditing*, https://www.hrsa.gov/provider-relief/reporting-auditing (last visited Jan. 31, 2023).

49.     HRSA continued to distribute PRF Program funds across a series of phases. These subsequent phases required the recipient to proactively apply for those funds. *HRSA Provider Relief Fund Past General Distributions*, https://www.hrsa.gov/provider-relief/past-payments/general-distribution (last visited Jan. 31, 2023).

50.     The Terms and Conditions of subsequent phases governing eligibility, use of the funds, and the accounting for the use of those funds generally follow those of Phase 1. *See, generally, Phase 2 General Distribution Relief Fund Payment Terms and Conditions*, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-conditions-phase-2-general-distribution-relief-fund.pdf (last visited Jan. 31, 2023).

51.     Relevant portions of those Terms and Conditions include the following:

a.     "The Recipient certifies that it provides or provided after January 31, 2020 diagnoses, testing, or care for individuals with possible or actual cases of COVID-19; is not

currently terminated from participation in Medicare or precluded from receiving payment through Medicare Advantage or Part D; is not currently excluded from participation in Medicare, Medicaid, and other Federal health care programs; and does not currently have Medicare billing privileges revoked."

b. "The Recipient certifies that the Payment will only be used to prevent, prepare for, and respond to coronavirus, and that the Payment shall reimburse the Recipient only for health care related expenses or lost revenues that are attributable to coronavirus."

c. "The Recipient certifies that it will not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse."

d. "The Recipient certifies that all information it provides as part of any application for the Payment, as well as all information and reports relating to the Payment that it provides in the future at the request of the Secretary or Inspector General, are true, accurate and complete, to the best of its knowledge. The Recipient acknowledges that any deliberate omission, misrepresentation or falsification of any information contained in this Payment application or future reports may be punishable by criminal, civil, or administrative penalties, including but not limited to revocation of Medicare billing privileges, exclusion from federal health care programs, and/or the imposition of fines, civil damages, and/or imprisonment."

e. "The Recipient shall maintain appropriate records and cost documentation including, as applicable, documentation described in 45 CFR § 75.302 – Financial management and 45 CFR § 75.361 through 75.365 – Record Retention and Access, and other information required by future program instructions to substantiate the reimbursement of costs under this award. The Recipient shall promptly submit copies of such records and cost documentation upon the request of the Secretary, and Recipient agrees to fully cooperate in all audits the Secretary, Inspector General, or Pandemic Response Accountability Committee conducts to ensure compliance with these Terms and Conditions."

*See* https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-and-conditions-provider-relief-30-b.pdf (last visited Jan. 31, 2023).

52.      The reporting requirements of the PRF Program required recipients to submit reports at different deadlines depending on the timing of the distribution. *See* "Important Dates for Reporting," https://www.hrsa.gov/provider-relief/reporting-auditing/important-dates (last visited Jan. 31, 2023).

53.     Reporting Period 1 covers payments of greater than $10,000 received under the PRF Program between April 10, 2020, and June 30, 2020. Monies received during Period 1 were available for use from January 1, 2020, to June 30, 2021. The deadline to file the report for Period 1 was September 30, 2021, which was subsequently extended to November 1, 2021, by HRSA. *Id.*

54.     Reporting Period 2 covers payments of greater than $10,000 received under the PRF Program between July 1, 2020, and December 31, 2020. Monies received during Period 2 were available for use from July 1, 2020, to December 31, 2021. The deadline to file the report for Period 2 was March 31, 2022. *Id*.

55.     Per the terms of the PRF Program, a provider could choose to justify its retention of PRF funds and avoid repaying the Government by either showing lost revenue attributable to coronavirus at its locations or demonstrating that the funds were used for allowable expenses that prevented, prepared for, and responded to the pandemic. *See* https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-and-conditions-provider-relief-30-b.pdf (last visited Jan. 31, 2023).

56.     For providers choosing to retain funds based upon lost revenue, the recipient may show lost revenue through one of three methods: difference between actual patient care revenues, difference between budgeted and actual patient care revenues, and any reasonable method of estimating revenues. *HRSA Provider Relief Fund Lost Revenue Guide*, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/prf-lost-revenues-guide.pdf (last visited Jan. 31, 2023).

**Factual Allegations**

*Rennova's Corporate Structure*

57.     Rennova is a publicly-traded Delaware corporation with headquarters in West Palm Beach, Florida.

58.     Prior to 2017, Rennova provided healthcare services through its network of subsidiaries within a number of fields in the healthcare industry, including diagnostic laboratories, electronic health records, and medical billing and financial services.

59.     Beginning in 2017, Rennova exited these areas in favor of transforming itself into an investor in hospitals and acquired three hospitals in Tennessee:

      a.   Rennova purchased Scott County on January 13, 2017 for $1,000,000;

      b.   Rennova purchased Jamestown on June 1, 2018 for approximately $700,000; and

      c.   Rennova obtained a lease to run Jellico Hospital on March 5, 2019 for $658,537.[1]

60.     To date, Rennova has not purchased any additional hospitals.

61.     In addition to these hospitals, Rennova owns or has owned two other medical service providers: Mountain View Physician Practice, Inc., a physician practice tied closely to Jamestown that is no longer in operation, and CarePlus Rural Clinic, LLC, a rural health clinic in Williamsburg, Kentucky.

62.     Following the acquisition of the hospitals, Rennova sought to consolidate operational areas in these hospitals to become more efficient and eliminate duplicative costs. As part of this consolidation effort, financial and accounting services for the hospitals were transferred from in-house employees to Rennova's corporate office in West Palm Beach, Florida. Upon

---

[1] The purchase agreement for Jellico was made available by Mr. Diamantis. *See* Rennova Fiscal Year 2020 10-K, p. 4, available at https://ir.rennovahealth.com/all-sec-filings/content/0001493152-21-008884/0001493152-21-008884.pdf (last accessed Jan. 31, 2023).

transfer, these efforts were handled and overseen by Seamus Lagan with the assistance of Krysti Dymond, a treasury analyst for Rennova Health, Inc.

63.     On a daily basis, at the supervision of Ms. Dymond, and at the direction of Mr. Lagan, the accounts receivables for the Tennessee hospitals would be "swept," meaning all deposits into the hospitals' bank accounts would be transferred from these accounts and placed into the bank account of a separate entity.

64.     Prior to 2021, the recipient account for these "sweeps" was a bank account held by Defendant PB Laboratories, a defunct laboratory subsidiary of Rennova. During the timeframe relevant to this Complaint, PB Laboratories did not operate as a laboratory.

65.     From 2021 to the present, the recipient account for these "sweeps" has been Defendant Platinum Financial Solutions. Mr. Lagan is the President of Platinum Financial Solutions.

66.      Both PB Laboratories and Platinum Financial Solutions are or were subsidiaries wholly owned by Rennova.

67.     All money dispersed by these holding accounts is done at the discretion of Mr. Lagan. Generally, Ms. Dymond handled any requests by Mr. Lagan to transfer money between accounts or disperse payments to outside entities.

68.     In June 2020 and at the direction of Mr. Lagan, Rennova opened a new company, Rennova Community Health, Inc. ("RCH") in Knoxville, Tennessee to manage all hospital and physician office operations for its hospitals.

69.     Employees of RCH were responsible for preparing and submitting reports to HRSA in compliance with the Terms and Conditions of the PRF Program.

70.     Employees of RCH were charged with overseeing the corporation's federal applications, submissions, and compliance.

*Rennova's Corporate Structure and Tennessee Hospitals*

71.     Jamestown ceased operations in June 2019 after Medicare terminated it as a provider due to its failure to comply with conditions of participation in the program. *See Public Notice for Involuntary Termination of Medicare/Medicaid Provider Agreement*, https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Termination-Notice-Tennessee-Jamestown-Regional-Medical-Center-05-29-2019.pdf (last accessed Jan. 31, 2023).

72.     Rennova continues to own Jamestown, but no patients have been treated at its physical location since June 2019.

73.     Rennova maintains Jamestown's corporate status with the State of Tennessee with the declared intent to re-open at a future date. *See* Rennova Form 10-K for the Fiscal Year 2021, p.4, available at https://ir.rennovahealth.com/all-sec-filings#document-15819-0001493152-22-010066 (last accessed Jan. 31, 2023).

74.     After the closure of Jamestown, Rennova continued to employ individuals through the Jamestown corporation but assigned those employees to work at its other hospitals in Tennessee.

75.     On March 1, 2021, the City of Jellico revoked Rennova's lease for Jellico Hospital due to violations of the terms of the lease. *Id.*

76.     The revocation of Rennova's lease for Jellico Hospital stemmed from Rennova's inability to operate the hospital as a "general acute care hospital" and to maintain the physical plant, namely the boiler, HVAC system, and plumbing.

77.     The revocation of Rennova's lease followed frequent instances where Rennova was unable to meet payroll demands in a timely manner both before and during the COVID-19 pandemic. On several occasions, payroll for staff was several weeks behind schedule in late 2020.

78.     At the time of its lease revocation in March 2021, Jellico Hospital had not admitted a patient since late November 2020, due to lack of funds to pay staff and to purchase necessary equipment. *Jellico hospital closed, operator leaves facility days after city votes to cut ties*, (March 2, 2021) https://www.wbir.com/video/news/jellico-hospital-closed-operator-leaves-facility-days-after-city-votes-to-cut-ties/51-688573da-0eba-4f33-8601-dbc2a7f14a80 (last accessed Jan. 31, 2023). Mr. Lagan stated in March 2021 that Jellico Hospital required "probably $500,000 or more" to remediate the deficiencies in the building. *Id*.

79.     After the revocation of the lease, Rennova maintained Jellico as a corporate entity despite operations of the hospital transferring to another entity.

80.     While in operation, Jellico did not operate with a budget. Control of its finances, payment of invoices, payment of payroll, oversight of accounts receivable, and other significant financial concerns were handled by Rennova, RCH, and Mr. Lagan, not by the local CEO.

81.     Rennova continues to own and operate Scott County.

82.     Like Jellico, Scott County does not operate with a budget. Control of its finances, payment of invoices, payment of payroll, oversight of accounts receivable, and other significant financial concerns are handled by Rennova, RCH, and Mr. Lagan, not the local CEO.

*Christopher Diamantis' Role at Rennova*

83.     Mr. Diamantis has been Rennova's most prominent and most significant investor since he began his involvement with the company in 2013.

84.     In March 2021, Mr. Diamantis claimed to have provided cash loans or assumed debt totaling $32.1 million. *See* E-mail from Chris Diamantis to Seamus Lagan (Mar. 14, 2021), attached hereto and incorporated herein as Exhibit A.

85.     His investments have provided him with significant influence over the operations of the corporation. On June 30, 2020, Mr. Diamantis converted $18.8 million in outstanding debt owed to him by Rennova into Series M Convertible Stock. Mr. Diamantis' Series M holdings are equal to 51% of the outstanding voting shares of all Rennova voting securities. *See* Rennova Fiscal Year 2020 10-K, p. 42.

86.     In August 2020, Mr. Diamantis entered into a proxy voting agreement, granting these voting rights to Mr. Lagan. *Id.* at 4.

87.     At the onset of the COVID-19 Pandemic, Mr. Diamantis contacted banking institutions on behalf of Rennova to assist their efforts in obtaining government assistance during the pandemic, particularly to assist in the application of Paycheck Protection Program ("PPP") loans. Indeed, Mr. Diamantis marshaled much of Rennova's efforts to obtain PPP loans.

88.     On April 8, 2020, Mr. Diamantis connected Mr. Lagan with the CEO of Evolve Bank & Trust to assist Rennova in moving its operating accounts from their current banking institution, Wells Fargo, to Evolve. *See* E-mail from Chris Diamantis to Seamus Lagan (Apr. 8, 2020), attached hereto and incorporated herein as Exhibit B. This move was made to facilitate applications for PPP relief. *Id.*

89.     On April 17, 2020, Mr. Diamantis, in a communication with Evolve Bank, told the bank that he was "fighting for a couple hundred people and their families right now" and offered to personally guarantee loans to Rennova under the PPP if needed. *See* E-mail from Chris

Diamantis to Mark Donovan (Apr. 17, 2020 at 2:39 p.m.), attached hereto and incorporated herein as Exhibit C.

90.     Days earlier, in an e-mail to Mr. Lagan, Mr. Diamantis instructed Mr. Lagan as to how monies received from a variety of sources, including PPP funds, should be dispersed. *See E-mail from Chris Diamantis to Seamus Lagan* (Apr. 13, 2020), attached hereto and incorporated herein as Exhibit D. Mr. Diamantis instructed Mr. Lagan that of the $6 million of funds expected to be given to the company, he intended to "take" $3.5 million. *Id*.

91.     On April 30, 2020, Mr. Diamantis told Mr. Lagan that when PPP loans were delivered to Rennova, Mr. Lagan was to retain only what was "critical" and that he "will be taking the difference." *See E-mail from Chris Diamantis to Seamus Lagan* (Apr. 30, 2020), attached hereto and incorporated herein as Exhibit E.

92.     As detailed below, Mr. Diamantis not only was able to take portions of PPP loans that he was integral in obtaining, but also significant portions of distributions to Rennova's hospitals through the PRF Program.

93.     Mr. Diamantis was not only involved in lending and banking issues with Rennova but was also kept involved with the financial state of the company and the pertinent issues. *See, e.g.*, *E-mail from Seamus Lagan to Chris Diamantis* (Jan. 29, 2021), attached hereto and incorporated herein as Exhibit F.

*Receipt of Provider Relief Funds and Government Funds*

94.     From April 10, 2020 through July 15, 2020, Rennova's Tennessee hospital subsidiaries received seven distributions through the Provider Relief Fund Program.[2]

---

[2] CarePlus and Mountain View received provider PRF distributions during the relevant timeframe. Those distributions are not at issue in this Complaint.

a. On April 10, 2020, Jamestown received $121,721.59 in Distribution Wave 1. Jamestown attested to the receipt of those funds on April 29, 2020.

b. On April 10, 2020, Scott County received $152,214.15 in Distribution Wave 1. Scott County attested to the receipt of those funds on April 29, 2020.

c. On April 10, 2020, Jellico received $110,209.64 in Distribution Wave 1. Jellico attested to the receipt of those funds on April 29, 2020.

d. On April 24, 2020, Jellico received $99,451.50 in Distribution Wave 4. Jellico attested to the receipt of those funds on April 29, 2020.

e. On May 6, 2020, Jellico received $3,486,128.72 in Distribution Wave 7 (Rural). Jellico attested to the receipt of those funds on June 3, 2020.

f. On May 6, 2020, Scott County received $3,319,556.78 in Distribution Wave 7 (Rural). Scott County attested to the receipt of those funds on June 3, 2020.

g. On July 15, 2020, Jellico received $5,000,000.00 in Distribution Wave 12C (Safety Net Hospital 2). Jellico attested to the receipt of those funds on August 18, 2020.

95.     Rennova accepted these funds and agreed to abide by the Terms and Conditions of the PRF Program. Electronic attestations for each of the PRF distributions listed in Paragraph 94 are attached hereto and incorporated herein as Exhibit G.

96.     In addition to affirmatively attesting to the receipt of the funds and accepting the Program's Terms and Conditions, each hospital retained the funds for longer than 90 days, which also serves as acceptance of the Terms and Conditions of the PRF Program.

97.     On June 1, 2020, Jellico submitted a payment return for $32,408.33 related to its Wave 1 Distribution.

98.     All three Rennova hospitals in Tennessee received Paycheck Protection Program ("PPP") loans in the second quarter of 2020: Jellico received $836,400, Scott County received $805,400, and Jamestown received $400,800.

99.     Rennova also submitted applications and received approval for PPP loans for other subsidiaries in its corporate umbrella that are not subject to this action. In total, Rennova received $2,448,046 in Paycheck Protection Program funds.

100.    In applying for these PPP loans, Rennova made affirmative statements regarding revenue figures and employee/payroll figures for these corporations. In these, Rennova identified only one individual as an owner with a 20 percent or greater interest in each company—Christopher Diamantis. All applications post-date his resignation from Rennova's Board of Directors in February 2020. *See*, *e.g.*, Rennova 2020 PPP Application, attached hereto and incorporated herein as Exhibit H; Health Technology Solutions 2021 PPP Application, attached hereto and incorporated herein as Exhibit I.

*Funneling of PRF Program Funds to Lenders and Insiders*

101.    At Mr. Lagan's direction, Rennova transferred PRF Program funds to institutional lenders, Mr. Diamantis, and Mr. Lagan himself. These distributions were not scheduled, were not tied to any "calls" or "demands" made on outstanding loans, and were not tied to any contractual obligations that required immediate payment.

102.    During the four-month period from April to August 2020 when Rennova subsidiaries received over $12.4 million in PRF Program funds, Mr. Diamantis received over $4.3 million in distributions from Rennova and its subsidiary, Defendant Medytox Medical Marketing & Sales, Inc. ("Medytox"):

a. During April and May 2020, Mr. Diamantis received $1,256,508.83 across 15 payments from a bank account held by Medytox;

b. In May 2020, Mr. Diamantis received $1,969,878.40 across 13 payments from a bank account held by Rennova; and

c. From June through August 2020, Mr. Diamantis received $1,079,362.00 across seven payments from Medytox (one payment) and Rennova (six payments).

103. In comparison, Mr. Diamantis received only $875,000 in total distributions from Rennova and Rennova subsidiaries during the preceding year (April 1, 2019 to April 1, 2020).

104. Payments to Mr. Diamantis can be directly traced to the PRF Program funds received by Rennova subsidiaries.

105. For example, on May 6, 2020, the PRF Program disbursed $3,486,128.72 to Jellico's bank operating account ending in -481. That same day, $3,487,552.15 was transferred from Jellico's -481 account to a bank account held by PB Laboratories ending in -216. *See* Redacted Jellico Medical Center May 2020 Bank Statement, attached hereto and incorporated herein as Exhibit J and Redacted PB Laboratories May 2020 Bank Statements, attached hereto and incorporated herein as Exhibit K. This transfer was made at Mr. Lagan's direction.

106. The balance in the Jellico operating account on May 5, 2020, prior to the receipt of PRF Program funds, was $10.35. *See* Ex. J. After the transfer of $3,487,552.15 to the PB Laboratories bank account, the Jellico operating account had a zero balance. *Id*. The Jellico operating account ended the month with $6,949.40 in funds. *Id*.

107. On May 6, 2020, the PB Laboratories account also received $3,326,160.80 from the Scott County bank operating account ending in -494. *See* Ex. K; Redacted Scott County May 2020 Bank Statement, attached hereto and incorporated herein as Exhibit L. This influx of funds,

22

done at Mr. Lagan's direction, corresponded to a PRF Program disbursement of $3,319,556.78 to the Scott County account on May 6, 2020. *Id*. The balance in the Scott County operating account on May 5, 2020, prior to the receipt of PRF Program funds, was $2,175.57. *See* Ex. L. The Scott County operating account ended the month with $11,659.50 in funds. *Id*.

108. On May 5, 2020, prior to receiving PRF Program monies from the Jellico and Scott County operating accounts on May 6, the PB Laboratories bank account balance was $69,164.17.

109. After receiving the PRF Program funds, that same   day—May 6, 2020—at Mr. Lagan's direction $1,050,000 was transferred from the PB Laboratories account to a bank account held by Medytox ending in -974. *See* Redacted Medytox May 2020 Bank Statement, attached hereto and incorporated herein as Exhibit M. That same day, Medytox, at Mr. Lagan's direction, transferred $1,000,000 to a bank account held by Mr. Diamantis. *Id*. On May 5, 2020, the balance in the Medytox account was $27,901.54. *Id*. Accordingly, the $1,000,000 payment to Mr. Diamantis on May 6 was made using PRF Program funds.

110. The flow of funds from the PRF Program to Mr. Diamantis on May 6, 2020, is graphically represented as follows:



111.    Payments to Mr. Lagan can also be directly traced to the PRF Program funds received by Rennova subsidiaries. For example, at Mr. Lagan's direction, an additional $443,600 was transferred from the PB Laboratories bank account to the Medytox account on May 6 and 7, 2020. Then on May 7, 2020, at Mr. Lagan's direction the Medytox account sent $110,809.47 to defendant Alcimede LLC, the consulting company owned by Mr. Lagan. The flow of funds from the PRF Program to Mr. Lagan's company Alcimede on May 6 and 7, 2020 is graphically represented as follows:



112.    The $110,809.47 payment was not required under the consulting agreement between Rennova and Alcimede LLC, which called for Rennova to pay Alcimede $15,625 twice per month. Those payments were made by Rennova on May 15, 2020 and June 1, 2020.

113.    In total, Mr. Lagan's company Alcimede received $642,962 from Rennova and its subsidiaries in 2020.

114.    PRF Program funds were also used to pay pre-existing debts held by institutional lenders, even though the debt instruments did not require the payments to be made at that time. For example, at Mr. Lagan's direction $260,000 in PRF funds were transferred from the PB Laboratories account to a Rennova bank account ending in -876 on May 11, 2020. *See* Redacted Rennova May 2020 Bank Statement, attached hereto and incorporated herein as Exhibit N. The

Rennova account then sent $250,000 to an institutional lender that same day. The flow of funds from the PRF Program to an institutional lender is graphically represented as follows:



115.    The Rennova -876 account had a balance of one dollar on May 10, 2020, prior to the transfer of $260,000 in PRF Program funds on May 11 from PB Laboratories. The subsequent $250,000 made to an institutional lender on May 11 was made using PRF Program funds.

*Rennova's Fraudulent Retention of PRF Funds – Jamestown Medical Center*

116.    Jamestown received its Wave 1 Distribution of $121,721.59 on April 10, 2020, attested to receipt of the funds on April 29, 2020, and retained the funds for more than 90 days.

117.    Jamestown ceased its hospital operations in June 2019 and has not treated a patient since.

118.    Jamestown did not care for or treat any patients during the COVID-19 pandemic at its location in Jamestown, Tennessee, regardless of whether the patient was infected with the coronavirus.

119.    A primary requirement of the PRF Program requires recipients to certify that after January 31, 2020, the recipient provided care to individuals with possible or actual cases of COVID-19.

120.    In September 2020, Rennova internally classified the Jamestown payment as a liability "with the expectation that it will most likely need to be repaid" because the facility was not in operation.

121.    In October 2020, HHS issued a recoupment letter directing Jamestown to return the entire PRF distribution it had received, and providing instructions on how to do so. The letter explained that Jamestown did not provide care to individuals with possible or actual cases of COVID-19, and therefore was in violation of the terms and conditions of payment. *See* Recoupment Letter, attached hereto and incorporated herein as Exhibit O.

122.    Jamestown did not respond to the letter and did not return the PRF funds to the Government as directed.

123.    Neither Rennova nor Jamestown has issued a repayment to the United States related to the PRF Wave 1 Distribution to Jamestown.

124.    As detailed below, Rennova submitted a report for Reporting Period 1 that sought to justify its retention of the PRF funds distributed to Jamestown and avoid an obligation to repay those funds to the United States.

125.    Despite a demand to return the PRF funds, Defendants have knowingly and unlawfully refused to return the PRF funds distributed to Jamestown.

126.    In submitting its report for Reporting Period 1, Defendants knowingly made false statements and concealed material information in order to retain PRF funds to which they were not entitled.

*Rennova's Fraudulent Retention of PRF Funds – Jellico*

127.    From April 2020 through July 2020, Jellico received four distributions through the PRF Program totaling $8,695,789.86.

128.    Jellico issued a repayment for $32,408.33 in PRF funds in July 2020.

129.    Aside from this single repayment, Rennova has retained the remaining $8,663,381.53 in PRF distributions Jellico received between April and July 2020.

130.    Jellico attested to the receipt of each distribution. *See* Ex. G.

131.    Jellico's Wave 1 and 4 payments were distributed without applications; however, Jellico submitted applications for the distributions received in Waves 7 ($3,486,128.72, received on June 3, 2020) and Wave 12C ($5,000,000, received on July 15, 2020). The first page of each application is attached hereto and incorporated herein as Exhibit P. These applications were submitted prior to the receipt of these distributions.

132.    Jellico's attestation for its Wave 1 payments was made on April 29, 2020, after receiving the funds on April 10 and April 24. More importantly, these attestations were made after Rennova had begun making nearly daily payments to Christopher Diamantis through a bank account held by Medytox Medical Marketing. From April 20 to April 29, 2020, Mr. Diamantis received 8 separate payments totaling $155,235.46.

133.    The attestation affirmed Jellico's commitment to use the PRF distributions in accordance with the Terms and Conditions of the Program, which permitted it to retain and use the funds.

134.    At the time of attesting to the receipt of these funds, Jellico's PRF distributions had been intermingled with all monies held by Rennova in its PB Laboratories bank account and had been used to give daily distributions to Mr. Diamantis.

135.    Jellico submitted its applications for Waves 7 and 12C after it had received its initial PRF distributions and after it had begun to make payments to Mr. Diamantis.

136.    Jellico's first three distributions, totaling $3,695,789.86, occurred during Reporting Period 1 for the PRF Program and required Jellico to submit a report during Report Period 1.

137.    After HRSA provided a 60-day grace period for reporting, the deadline to submit the report for Report Period 1 was November 1, 2021.

138.    Jellico's fourth distribution of $5 million occurred during Reporting Period 2 and required Jellico to submit a self-audit during Report Period 2, with a deadline of March 31, 2022.

139.    To meet the reporting requirement for Reporting Period 1, Rennova submitted an omnibus report to HRSA ("Period 1 Report") covering three separate entities—CarePlus Medical Center, Jellico, and Jamestown. *See* Rennova Health Service Reporting Period 1 Report, attached hereto and incorporation herein as Exhibit Q.[3] This report required the entities to report on its response to the COVID-19 pandemic through June 2021.

140.    The Period 1 Report disclosed receipt of the following PRF distributions, totaling $333,948.48:

     a.    $121,721.59 to Jamestown Medical Center, attested to on April 29, 2020;

     b.    $2,565.75 to CarePlus Medical, attested to on June 3, 2020;

     c.    $110,209.64 to Jellico Medical Center, attested to on April 29, 2020; and

     d.    $99,451.50 to Jellico Medical Center, attested to on April 29, 2020.

141.    The Period 1 Report failed to disclose the $3,486,128.72 distribution received by Jellico on May 6, 2020 and attested to on June 3, 2020.

142.    The Period 1 Report also failed to accurately disclose PPP funds received by these three entities. In this report, Rennova claimed to have received $75,000 in PPP funds during the

---

[3] Privileged and/or confidential identifying information has been redacted from the Defendants' reports that have been attached as exhibits.

second quarter of 2020, which is the amount CarePlus Medical obtained. Jellico received $836,400 and Jamestown received $400,800. In total these three entities obtained total of $1,312,200 in PPP funds during the second quarter of 2020.

143.   Rennova chose to justify its retention of PRF funds using the "Lost Revenues: 2019 Actual Revenue" method, which required it to calculate lost patient care revenues that was attributable to the COVID-19 Pandemic. This method compares actual revenue figures from 2019 to the actual revenue figures in 2020 and 2021 to determine lost revenue and the amount of the PRF distribution that may be retained. *HRSA Provider Relief Fund Lost Revenue Guide*, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/prf-lost-revenues-guide.pdf   (last visited Jan. 31, 2023).

144.   For these three entities, Rennova reported total revenue/net charges from patient care of $288,072 in 2019, $49,376 in 2020, and $55,953 in 2021 in the Period 1 Report.

145.   In addition to providing false revenue figures in its Period 1 Report, Rennova also provided inaccurate figures pertaining to its payroll, employment numbers, and patient care. Rennova claimed that Jellico, Jamestown, and CarePlus collectively employed four full-time employees and had zero inpatient admissions and zero emergency department visits during the reporting period.

146.   Medicare Part A claims data reflects that Jellico treated 869 unique patients from January 2020 through March 2021.

147.   PPP applications submitted for these entities similarly contradict the stated full-time employee number in the Period 1 Report. In April 2020, Jamestown Medical Center reported 18 full-time employees and Jellico reported 56 full-time employees. The Period 1 Report claims that the three entities had four total full-time employees in Q2 2020.

148.    For Reporting Period 2, Jellico submitted a report ("Period 2 Report") on March 31, 2022. Jamestown and CarePlus did not receive PRF payments during the relevant time and thus were excluded from reporting requirements for this period. *See* Jellico Community Hospital Reporting Period 2 Report, attached hereto and incorporation herein as Exhibit R.

149.    Jellico received a single PRF payment during Reporting Period 2—a $5 million payment in Wave 12C (Safety Net Hospital 2).

150.    In its Period 2 Report, Jellico justified the retention of the entirety of this $5 million payment under the "Lost Revenues: 2019 Actual Revenue" model, as Rennova did in its report for Reporting Period 1. In doing so, Jellico provided revenue numbers that were knowingly false.

151.    In the Period 2 Report, Jellico reported total 2019 revenue/net charges of $3,133,046. When breaking down its revenues on a quarterly basis, Jellico reported $0 revenue in the first and second quarter for 2019. In the Period 1 Report, Rennova attributed $288,072 during the same period for Jellico, CarePlus, and Jamestown.

152.    For 2020, Jellico then reported total 2020 revenue/net charges of $64,837 across 7,513 patient visits at Jellico Hospital.

153.    For 2021, Jellico reported a total of zero total revenue/net charges for Jellico, even though it claimed to have treated 852 patients in the first quarter of 2021 before the revocation of its lease in March 2021.

154.    Personnel metrics for Jellico in its Period 2 Report greatly differ from its metrics for the Period 1 Report. After claiming 4 full-time personnel between CarePlus, Jellico, and Jamestown in 2020, Jellico reported between 137 and 82 full-time employees at Jellico Hospital in 2020 and 78 full-time personnel for the first quarter of 2021. These figures contradict the Period 1 Report as well as its PPP application during the relevant time.

155.    In its Reporting Period 2 report, Jellico falsely claimed identical lost revenue figures for 2020 and 2021—$3,133,046.00 each year, for a total of $6,266,092. In making these calculations, Jellico did not even subtract the $64,837 it inaccurately claimed to receive in total 2020 revenue.

156.    Rennova's lost revenue model for 2021 reflects that the $3,133,046.00 is attributable to the third and fourth quarters of 2021, after it lost the lease for Jellico Hospital and no longer operated the facility.

157.    Rennova's claim of over $3 million in lost revenue *attributable to coronavirus* in 2021 is particularly egregious as it lost its lease due to its failure to operate Jellico Hospital as a general acute care hospital and its failure to maintain the facility—a decidedly non-COVID-19 reason.

158.    Rennova submitted information to the Government during the relevant time that contradicts the revenue figures and personnel metrics in its Reporting Period 1 and 2 reports.

159.    In PPP applications, Jellico submitted an IRS Form 941—a federal tax return document signed under the penalty of perjury—for the first quarter of 2020 for Jellico. This form claimed that Jellico had 56 full-time employees during the first quarter of 2020.

160.    Jellico's report for Reporting Period 2 claimed 137 full-time employees for the same timeframe.

161.    When applying for distribution as a Rural Safety Net Hospital, Rennova falsely attested that Jellico's estimated *monthly* lost revenue figures for March and April 2020 were each roughly $3.5 million.

162.    Medicare reimbursements reported on behalf of Jellico in the self-audits for Reporting Periods 1 and 2 are also inaccurate.

163.    Claims data for Medicare reveals that Jellico received paid revenues for 2019 of $2,008,319.84, for 2020 of $585,634.54, and $26,779.59 for the first quarter of 2021 for Medicare Parts A and B.

164.    The Period 1 Report lists the total paid revenue under Medicare Part A and B for the three entities of $10,584.00 for 2019, $9,860.00 for 2020, and $39,715.00 for 2021.

165.    The Period 2 Report lists the total paid revenue under Medicare Part A and B for Jellico Medical Center of $1,380,714.00 for 2019, $25,174.00 for 2020, and $0.00 for 2021.

166.    In its reports, Jellico submitted inconsistent revenue figures for the revenues it received under Medicare for 2019, 2020, and 2021, both sets of revenue figures also being inconsistent with revenue figures maintained by the Government.

167.    Aside from the Period 1 and Period 2 Reports, Rennova has not submitted on behalf of Jellico any records or cost documentation to the United States that it is required to maintain as a term and condition of the PRF Program.

168.    Neither Rennova nor Jellico has provided reports to the United States justifying retention of $8,695,789.86 in PRF funds.

169.    Rennova and Jellico submitted reports to the United States that knowingly avoided repayment of PRF distributions.

170.    In submitting the self-reports for Reporting Periods 1 and 2, Defendants knowingly made false statements and concealed material information in order to retain PRF funds to which they were not entitled.

## CAUSES OF ACTION

### Count I: False Statements (31 U.S.C. § 3729(a)(1)(B))

171.    The United States re-alleges and incorporates in this Count I, Paragraphs 1 through 170 of this Complaint in Intervention.

172.    Defendants Rennova Health, Inc., PB Laboratories, LLC, Medytox Medical Marketing & Sales, Inc., Seamus Lagan, Alcimede, Inc., Jellico Medical Center, Inc., Jamestown TN Medical Center, Rennova Community Health, Inc., and Platinum Financial Solutions, LLC, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, and/or to get the United States to pay or approve false or fraudulent claims, specifically, that hospitals owned and operated by Rennova Health, Inc., would accept, retain, and utilize funds distributed through the Provider Relief Fund Program within the Terms and Conditions of the Program, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(B).

173.    Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $13,508.00 and not more than $27,018.00 for each violation.

## Count II: Reverse False Claims (31 U.S.C. § 3729(a)(1)(G))

174.    The United States re-alleges and incorporates in this Count II, Paragraphs 1 through 170 of this Complaint in Intervention.

175.    Defendants Rennova Health, Inc., PB Laboratories, LLC, Medytox Medical Marketing & Sales, Inc., Seamus Lagan, Alcimede, Inc., Jellico Medical Center, Inc., Jamestown TN Medical Center, Rennova Community Health, Inc., and Platinum Financial Solutions, LLC, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of the FCA, 31 U.S.C. § 3729(a)(l)(G).

176.    Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $13,508.00 and not more than $27,018.00 for each violation.

## Count III: Unjust Enrichment

177.    The United States re-alleges and incorporates in this Count III, Paragraphs 1 through 170 of this Complaint in Intervention.

178.    By reason of the foregoing conduct and violation of federal law, Defendants Rennova Health, Inc., PB Laboratories, LLC, Medytox Medical Marketing & Sales, Inc., Seamus Lagan, Alcimede, Inc., Jellico Medical Center, Inc., Jamestown TN Medical Center, Rennova Community Health, Inc., Platinum Financial Solutions, LLC, and Christopher Diamantis were unjustly enriched and are liable to account for and pay such amounts, which are to be determined at trial, to the United States.

179.    The Defendants were conferred a benefit by the United States through the Provider Relief Fund Program, which they voluntary accepted and retained but whose continued retention is inequitable.

## PRAYER FOR RELIEF

180.    Wherefore, Plaintiff, the United States, demands judgment in its favor and against Defendants as follows:

   a.   Under Counts I and II (FCA), for an amount of the United States' damages, trebled as required by law, plus such civil penalties in an amount between $13,508.00 and $27,018.00 for each and every false claim as are required by law, together with all such further relief as may be just and proper;

   b.   Alternatively, under Count III (Unjust Enrichment), for an accounting and the amount by which Defendants were unjustly enriched, plus interest and costs, and expenses, and all such further relief as may be just and proper;

   c.   Such other relief as this Court may deem just and proper, together with interest and costs of this action.

THE UNITED STATES DEMANDS A JURY TRIAL AS TO ALL ISSUES SO
TRIABLE.

Dated: February 3, 2023                Respectfully submitted,

                                       MARKENZY LAPOINTE
                                       UNITED STATES ATTORNEY

                                       DAVID WERNER
                                       Assistant United States Attorney
                                       Fla. Bar. No. 113436
                                       99 N.E. 4th Street
                                       Miami, Florida 33132
                                       Telephone: (786) 439-3194
                                       Facsimile: (305) 530-7139
                                       Email: David.Werner@usdoj.gov
                                       **Counsel for United States of America**

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on February 3, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: David Werner
Assistant United States Attorney

## SERVICE LIST

Jonathan Kroner, Esq.
Florida Bar No. 328677
**Jonathan Kroner Law Office**
6001 N Ocean Dr., Ste. 806
Hollywood, FL 33019-4617
305.310.6046
jk@FloridaFalseClaim.com

Royston H. Delaney, Esq.
**RORY DELANEY, ESQ., LLC**
50 Congress Street, Suite 600
Boston, Massachusetts 02109
(857) 498-0384
rory@rorydelaney.com

Ilyas J. Rona, Esq.
**MILLIGAN RONA DURAN & KING LLC**
50 Congress Street, Suite 600
Boston, Massachusetts 02109
(617) 395-9570
ijr@mrdklaw.com
***Counsel for the Relator***

Erik R. Matheney
Ematheney@shutts.com
S. Elizabeth King
Eking@shutts.Com
**Shutts & Bowen**
4301 W. Boy Scout Suite 300
Tampa, FL 33607
USA
(813) 227-8123
***Counsel for Defendants Rennova Health, Inc., PB Laboratories, LLC, Medytox Medical Marketing & Sales, Inc., Seamus Lagan, Alcimede, Inc., Jellico Medical Center, Inc., Jamestown TN Medical Center, Rennova Community Health, Inc., and Platinum Financial Solutions, LLC***

Daniella Renee Lee
Dlee@ebglaw.Com
**Epstein Becker Green**
One Beach Drive Se Suite 303
St. Petersburg, FL 33701
(727) 346-3771
***Counsel for Defendant Christopher Diamantis***